UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| JEANNE SUCHANEK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 10-19-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| UNIVERSITY OF KENTUCKY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

*** *** *** ***

This matter is pending for consideration of several motions, including Plaintiff Jeanne Suchanek's motion *in limine*[1] in which she seeks to exclude testimony from Mary Plank and Ben Withers regarding her work performance. [Record No. 56] Suchanek also has filed a separate motion in which she seeks to prevent certain handwritten notes from being admitted during trial. [Record No. 57] Both motions are now ripe for review. Having reviewed the plaintiff's *in limine* motions and the defendants' response, the Court will deny the relief requested by Suchanek.

---

[1] Generally, a ruling on an *in limine* motion constitutes a preliminary opinion which allows the parties to better formulate their trial strategy. *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). However, the Court is not bound by an *in limine* ruling, and can change its determination during trial if sufficient facts develop to warrant the change. *Id*; *see also Luce*, 469 U.S. at 41–42 (noting that "*even if nothing unexpected happens at trial*, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling"(emphasis added)). The motion has more significance here, inasmuch as the plaintiff seeks to prevent the subject evidence from being considered in connection with the defendants' motion for summary judgment. [*See* Record No. 55.]

-1-

## I. The Deposition Testimony of Mary Plank

Mary Plank was deposed in this action on January 12, 2011. At times relevant herein, Mary Plank was employed by the University of Kentucky, College of Fine Arts, as an administrative staff officer in charge of fiscal affairs. [*See* Record No. 55; Defendants' Motion for Summary Judgment, Exhibit 27 (Plank Deposition Transcript, p. 4).] In explaining her relationship with Suchanek, Plank provided the following testimony which the plaintiff seeks to limit through her present motion:

> Q. Did you and Ms. Suchanek get along?
>
> A. Well, there were – actually, at that point, our relationship got a lot better. I wouldn't say we didn't get along. There were frustrations. It was difficult – follow-through was not her strong suit. There were issues with checks getting left in the safe that she was to deposit for long periods of time, not getting responses from her with things that I needed. Our roles interfaced somewhat. After she left, there were four or five endowments that I had been trying to get information about that had been hanging for two or three years that she didn't follow through on. I couldn't set up the endowment until she got the endowment agreement to me. So there were some frustrations, I'll say that.
>
> Q. Can you think of any other frustrations?
>
> A. Well, I recall one rather stunning incident the first year of my employment.
>
> Q. Which was in 1998?
>
> A. 1998. The Dean could not find her. Her office was down the hall. She always kept her door locked when she was in her office. But he had gone down the hall a half dozen times looking for her and he came in very frustrated, "Where is she?" "I have no idea." And he said, "Well, call her at home. Tell her I want this taken care of today." They were working on some development issue and I don't recall the details of it. So I called her at home and she angrily asked me how I knew she was at home and I said, well, you weren't here. That was my first assumption. The Dean asked me to find you. And she said that she had just taken a long soak in the tub. She was sitting home with her feet up drinking tea. I said the Dean asked me to ask you to ask you to take care of this, whatever it was with the donor, today. And she said you take care of it. I said well,

the Dean asked me to ask you to take care of it and then she very angrily said for me to tell him that she was taking care of it today by delegating it to me and that she realized I didn't have the luxury of doing what she was doing and relaxing at home but that is just too bad. I was stunned because we were both professional level employees. Granted, she was a number of grade levels above me but I wasn't sure what she thought she was entitled to that. I wasn't but the Dean had had no clue where she was. She had not reported in. That was not the only incident when he couldn't find her and nobody knew where she was.

\*\* \*\* \*\*

Q. One question I meant to follow up on, you talked about in 1998, you talked about several times about how Ms. Suchanek lost checks and even after she left, you were still looking for checks and I'm assuming that kind of went on since 1998.

A. It wasn't checks when she left. There were endowment agreements. What happens with that is when a check comes in, it gets put in a holding account in Central Development until the endowment agreement, which was Ms. Suchanek's responsibility to see that the endowment agreement got drawn up. So the check had been deposited for these things when she left but the endowment agreements, the donor had made the request and they had just dropped in the deep blue sea.

Q. What about the lost checks though? You mentioned that too.

A. I know there were a couple of times that there were checks lost and there were occasions she would put checks in the safe and not come get them for – one time, it was several months that there was a stack of checks she left in the safe.

[*Id.*, at pp. 18-20, 40-41]

## II. The Deposition Testimony of Ben Withers

Ben Withers has been employed as Professor of Art History and Chair of the Department of Art by the University of Kentucky since 2004. Withers was deposed in this action on February 2, 2011. During this deposition, Withers was asked about his professional interactions with Suchanek. He provided the following testimony which is the subject of the current motion:

Q. So how often would you say that you had meetings with Ms. Suchanek regarding financing?

> A. It varied. Sometimes we would have meetings maybe once or twice a week. Usually we would go months between having any officials [sic] kind of meetings. There were times when Jeanne would say that we should meet regularly say, every two weeks and then she just didn't follow through. So we didn't follow – we didn't have those meetings every two weeks. I'd put them on my calendar and, you know, something else would come up or there'd be some other interruption and she couldn't – usually it was her that couldn't make the meetings.
>
> Q. So when you say she didn't follow through, would she contact you and let you know there was a scheduling conflict? Or what do you mean when you say she wouldn't follow through?
>
> A. Most of the time she would call me and say that there was some other obligation that had kept her from doing this. Sometimes that wouldn't happen. But what I'm referring to is, it was her suggestion that we have regular meetings every two weeks. But then when the next two weeks – when the first time would come up with that next two weeks, there would be something that would interrupt us and we never set up the next meetings. That happened two or three times.

[*See* Record No. 56; Exhibit 1 (Withers Deposition Transcript, pp. 9-10).]

Additionally, Withers described other complaints and/or problems in dealing with Suchanek regarding relations and communications with donors.

> Q. Did you have any problems or complaints working with Ms. Suchanek?
>
> A. Well I could think of a couple of occasions where we had some issues. There was one donor who was actually the husband of one of our faculty members, Joel Feldman is his name, who arranged to have his mother give a small donation to the art department. I think it was in the neighborhood of about a thousand dollars. And his mother was elderly, needed a tax write-off near the end of the year. So he arranged for her to send this check to us. We never received the check. We didn't, but he insisted that the check had been sent and had been sent in care of the development part of the Dean's office and we in the department never saw that come up. So I don't know what happened to that particular check. I don't know where, if it got lost in the post office or wherever. Jeanne tried to help us find that check, but we never saw where it went too [sic]. And ultimately we had to have Joel's mother go through the process, the bank process of canceling the first check and sending us another. And subsequently she decided not to give any donations after that. The second time –
>
> Q. You said it was addressed to the development office?

> A. To the college.
>
> Q. Did Dr. Shay ask you or inquire about that situation, like what happened or what was your knowledge about the situation?
>
> A. I don't think he was apprised of that particular problem. I didn't talk to him about that problem.
>
> Q. So when I asked you if you had any problems or complaints about Ms. Suchanek, you brought up this Joel Feldman situation. Did you address Ms. Suchanek with regards to this being a problem you felt that she was responsible for?
>
> Q. I'm not really sure who was responsible for this particular problem because the check was sent to the college office and normally if a check came to the college office it would go to her, just as if it came to the department office we'd take it over to her. So part of the process of trying to figure out where the check went awry would have involved talking to the Dean's secretary and talking to Jeanne about if the check had arrived or if had made it to Jeanne and then had been processed and been some delay or something like that. But that's – I bring that up because that was one of the complaints that would brought to me. It was Joel Feldman who was very irate about the check thing. And again, it went to that college office and that's all I know.

[*Id.*, at pp. 13-14]

According to Suchanek, the above-quoted testimony should be excluded because it is being offered in violation of Rule 404(b) of the Federal Rules of Evidence which excludes evidence of "other bad acts" to prove the character of a person. The plaintiff argues that, because this evidence was not utilized in plaintiff's negative performance evaluations, it should not be admitted during trial. And she further contends that, even it the evidence is admissible under Rule 402 of the Federal Rules of Evidence, it should be excluded under Rule 403 as being unfairly prejudicial. [Record No. 56] Having considered the subject testimony, the Court rejects both arguments.

The fact that the plaintiff was not disciplined or terminated for poor work performance does not mean that such evidence should be excluded by the Court or jury in evaluating the claims of discrimination asserted in this action. Suchanek claims that she was a victim of disability discrimination because she was subjected to untrue or inaccurate negative performance evaluations. The evidence Suchanek seeks to exclude is relevant to the issue of whether her performance evaluations were untrue or inaccurate. Thus, the expected testimony is directly relevant to and probative of the plaintiff's claims and the university's defense that it acted in a fair and uniform manner in dealing with Suchanek. Likewise, the subject testimony is not unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. Further, the Court concludes that the testimony in issue is neither misleading, confusing or cumulative.

### III. The Handwritten Notes of Patty Bender

During discovery, Defendant University of Kentucky produced certain handwritten notes of Patty Bender, Assistant Vice President for Equal Opportunity. These notes were prepared during Bender's investigation of the plaintiff's complaint. According to Plaintiff Suchanek, the defendant plans to offer these notes: (i) as evidence to substantiate its finding of no discrimination and (ii) to bolster any arguments of poor performance by Suchanek during her employment with the university.

Plaintiff Suchanek describes the notes in her second motion *in limine* as containing allegations of other acts that were not the subject of any reprimand or discipline. Instead, Suchanek asserts that these notes pertain to conversations between Bender and Defendant Shay regarding plaintiff's attendance issues, as well as issues involving Suchanek hiding in her office

and issues involving the cleanliness of the plaintiff's office. Other notes reflect an alleged conversation with Mike Richey in which Richey indicates that the plaintiff "was not a good development officer for the College of Fine Arts." According to Suchanek's counsel, Richey could not recall the recorded comment during his deposition. [Record No. 57, pp. 2-3] Suchnek seeks to exclude the subject notes under Rule 404(a) and (b), and Rule 403 of the Federal Rules of Evidence.

In response, the Defendants contend that Bender's notes are relevant and admissible. They argue that the subject notes are part of an internal investigation regarding the plaintiff's internal charge of discrimination filed with the university's internal office of Institutional Equity/Equal Employment Opportunity. Bender's investigation of this complaint included interviewing several witnesses including Suchanek, Defendant Shay, and Mike Richie who oversees Central Development for the University of Kentucky. Bender's notes reflect her conversations with these witnesses and are part of her investigation file. Thus, the defendants assert that the notes are admissible under Rule 402 of the Federal Rules of Evidence.

Having considered the parties' arguments regarding this issue, the Court concludes that the subject notes should not be excluded at this time. Based on the issues joined by the pleadings, the notes which are the subject of the plaintiff's second *in limine* motion appear to be relevant to the issue of Suchanek's job performance, her working relationship with others, whether the plaintiff was evaluated fairly when compared with the evaluations of other employees, and whether her negative job evaluations were reflective of her actual work. The notes in question are also relevant to whether the university defendant properly investigated the

plaintiff's complaints of discrimination. Likewise, the notes do not appear to be unduly prejudicial, confusing, misleading, or cumulative.

**IV. Conclusion**

The evidence and testimony sought to be excluded by Plaintiff Jeanne Suchanek is relevant to the claims and defenses asserted in this action. Further, it is not inadmissible under Rules 403 or 404(b) of the Federal Rules of Evidence. Accordingly, it is hereby

**ORDERED** that Plaintiff Jeanne Suchanek's motions *in limine* [Record Nos. 56 and 57] are **DENIED**.

This 2nd day of May, 2011.

Signed By:
*Danny C. Reeves* DCR
United States District Judge