UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| JEANNE SUCHANEK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 10-19-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| UNIVERSITY OF KENTUCKY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the defendants' Motion for Summary Judgment. [Record No. 55] For the following reasons, the defendants' motion will be granted.

## I.      Background

Jeanne Suchanek worked at the University of Kentucky from October 1998 until she resigned on April 25, 2009. During that time, she was employed as the Director of Development for the College of Fine Arts. In her position as Director, Suchanek was under the supervision of the Dean of the College of Fine Arts, Robert Shay. At its essence, this case arises out of the deteriorating relationship between Shay and Suchanek, which she alleges led to her resignation. Suchanek argues that Shay's treatment of her resulted from disability discrimination and retaliation, while Shay claims that he dealt with Suchanek fairly, but she simply failed to meet the expectations of a senior development officer at the University.

In 2005, Suchanek was diagnosed with breast cancer. When Suchanek learned of her diagnosis, she sent an e-mail to her department and informed her co-workers of her condition.

She informed them that she would be taking time off for surgery, but would be available by phone and e-mail. Suchanek requested, and was given, eight days off to undergo a lumpectomy. Following surgery, Suchanek completed seven weeks of radiation and began a five-year hormone treatment plan. Suchanek did not miss work for her radiation treatments; instead, she used her lunch breaks to attend medical appointments and receive treatment.

On the leave form for her surgery, Suchanek's absence was designated as temporary disability leave with pay. [Record No. 55-7] Suchanek now claims that she would have preferred the leave to be classified as FMLA leave. The University provided information to its employees regarding FMLA leave during new-employee orientation, in its staff handbook, and through its online listing of policies and procedures. The University also claims that it provided information regarding FMLA at a weekly staff meeting in April 2006. However, Suchanek claims she was not specifically informed of her FMLA rights at the time she requested leave.

Suchanek contends that, after returning to work, her doctor told her to "avoid bigger crowds" because of her weakened immune system. Suchanek also claims that she experienced other side effects resulting from her ongoing treatments, such as insomnia, persistent hot flashes, and fatigue. According to Suchanek, these limitations prevented her from performing her job in the same way she had prior to her diagnosis.

Substantial attention in this case is given to Suchanek's performance evaluations. Per University Policy, employees were evaluated by superiors on at least an annual basis. Yearly performance evaluations were completed in February and March for the prior year (*i.e.*, the 2007 evaluations were completed in March 2008). On her 2005 evaluation, completed March 3, 2006,

Suchanek received a score of 4.7 out of a possible 5 points. In regard to her cultivation of current and potential donors, Shay commented that Suchanek "[c]onsistently meets and/or exceeds expectations in this particularly." [Record No. 55-14, p. 2] Regarding her performance developing and implementing of solicitation strategies, Shay wrote, "Excellent strategist in more areas than just development." [*Id.*, p. 1]

However, beginning with her 2006 evaluation, Suchanek's scores began to drop. On her initial 2006 evaluation, Suchanek was given a 2.9 out of 5. Shay wrote that Suchanek's "[q]uality of work in [the development of new strategies] ha[d] diminished significantly." [Record No. 55-12] Shay cited an "unwillingness to develop [her] portfolio" of donors and a "[p]oor attitude toward Central Development." [*Id.*] In response to Shay's evaluation, Suchanek wrote the following comment on her evaluation form:

> I would like to explain the difference in this year's cultivation efforts and last year's efforts. Because of a diagnosis of early-stage breast cancer in late 2005, I was advised by my doctor to limit my exposure to crowds because of my immune system. I did not participate in cultivation efforts as I should have and tried to be more active in coordinating the efforts of the Dean and Department Chairs. Because of my complete recovery, I anticipate a much more aggressive plan of action in 2007, including following the Dean's strategy of contacting current and potential donors throughout Kentucky.

[Record No. 55-16, p. 4] The parties dispute whether Suchanek, in this comment, was the first to mention her breast cancer in connection with her performance. Suchanek claims that she wrote the comment in response to a discussion with Shay before the draft evaluation was provided to her. However, after Suchanek added her comment, Shay updated her evaluation, and noted at one point that "Jeanne's work with donors this year did diminish because of her

-3-

recovery from breast cancer." [*Id.*, p. 2] Along with his updated comments, Shay raised Suchanek's evaluation from a 2.9 to a 3.1.

Prior to the next year's evaluation, Suchanek spoke with the University's human resources department about how to dispute an evaluation. She was told to document her performance and complete a self-evaluation in preparation for her yearly evaluation. Also, in March 2008, Suchanek contacted Patty Bender, the University's Vice-President for Equal Opportunity, to voice her concerns that she was being discriminated against due to her breast cancer.

Before Suchanek's 2007 evaluation, Shay sent her an e-mail to inform her that he expected she would be disappointed with her ratings. Suchanek forwarded the e-mail to Bender, and the two exchanged e-mails regarding the process for lodging a discrimination complaint. [Record No. 55-21] When Suchanek eventually received the evaluation, Shay had given her a 2.05 rating. During this same time, Shay sent Suchanek a letter that described the University's tightening of its rating system in an attempt to "curb grade inflation." [Record No. 55-19]

A rating below three points meant Shay was required to place Suchanek on a Performance Improvement Plan (PIP). Shay did so, and monitored Suchanek's progress at thirty, sixty, and ninety-day intervals. Suchanek completed the PIP, with positive feedback from Shay in November 2008, but her 2008 evaluation nevertheless resulted in a rating of 2.4. Suchanek claims that the job standards applied for her 2008 evaluation were different – and significantly more stringent – than the standards that had been previously applied. She was placed on another PIP.

Suchanek resigned from the University on April 24, 2009. However, she classifies her resignation as "involuntary." [Record No. 64, p. 11] On May 18, 2009, Suchanek began work for a new employer. She was named the Director of Stewardship and Development for Mary Queen of the Holy Rosary Parish with the Diocese of Lexington.

On April 2, 2010, Suchanek filed this action in Franklin Circuit Court against the University and Shay, in his individual and official capacities. The defendants timely removed the case to this Court. [Record No. 1]

## II.    The Summary Judgment Standard

Summary judgment is appropriate when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* (c)(1). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, the nonmoving party must establish the existence of a genuine issue of material fact as to each essential element of its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    Analysis

Suchanek's Complaint contains seven counts: violation of the Family Medical Leave Act (FMLA); disability discrimination; disability harassment/hostile work environment; constructive discharge; retaliation; breach of implied contract; and intentional infliction of emotional distress. [Record No. 1-3] For each count, Suchanek has failed to raise a genuine issue of material fact

as to at least one element of a prima facie case. Therefore, each of her claims fails as a matter of law, and the Court will grant summary judgment in favor of the Defendants.

### A.    FMLA

There are two avenues for recovery under the FMLA: (i) an "entitlement" or "interference" theory and (ii) a "retaliation" or "discrimination" theory. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Suchanek alleges only an interference claim. [Record No. 64, p. 17 ("Suchanek's complaint does not allege a claim for retaliation or discrimination.")] A claim for FMLA interference arises under 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. To prevail on an interference claim, a plaintiff must prove:

(1)    the claimant was an "eligible employee" under 29 U.S.C. § 2611(2);
(2)    the employer was an "employer" under 29 U.S.C. § 2611(4);
(3)    the employee was entitled to leave under the FMLA;
(4)    the employee gave the employer notice of her intention to take leave; and
(5)    the employer denied the employee FMLA benefits to which she was entitled.

*Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 720 (6th Cir. 2003). The defendants have conceded that Suchanek was an eligible employee and that the University was an employer as defined by the FMLA. [*See* Record No. 55, p. 26] The Court thus begins its analysis with the third element.

### 1.    Entitlement to Leave

An employee is entitled to leave under the FMLA when she has "a serious health condition that makes [her] unable to perform the functions of [her] position." 29 U.S.C. §

2612(a)(1)(D).  Suchanek's breast cancer was a serious health condition.  *See* 29 U.S.C. §

2611(11) (defining "serious health condition" as "an illness . . . that involves . . . inpatient care

. . . or continuing treatment by a health provider"); *see also Gordon v. Bd. of Trs. of Governors*

*State Univ.*, No. 06-4957, 2007 U.S. Dist. LEXIS 31864, at *8 (N.D. Ill. Apr. 26, 2007) (noting

that the plaintiff "suffered from breast cancer, a serious medical condition").  It required both

inpatient care, during her lumpectomy, and continuing treatment by a health provider.  Thus, the

only question is whether her condition rendered her unable to perform the functions of her

position.

To the extent Suchanek's lumpectomy required her to miss eight days of work, it

prevented her from performing her job functions.  *See* 29 C.F.R. § 825.123 ("An employee who

must be absent from work to receive medical treatment for a serious health condition is

considered to be unable to perform the essential functions of the position during the absence for

treatment.").  Additionally, to the extent Suchanek actually had to miss work to undergo

radiation therapy, those times likely also qualified for leave.  *See* 29 C.F.R. § 825.115(e)(2)

(listing cancer, and treatments such as chemotherapy and radiation, as examples of "a condition

that would likely result in a period of incapacity . . . in the absence of medical intervention or

treatment").  Therefore, Suchanek has established that she was entitled to at least some leave

under the FMLA.

## 2.      Notice to the Employer

"Nothing in the statute places a duty on an employer to affirmatively grant leave without

such a request or notice by the employee."  *Brohm v. Jh Props.*, 149 F.3d 517, 523 (6th Cir.

1998). Before taking FMLA leave, an employee must provide notice and a qualifying reason for taking the leave. *Id.* The defendants argue that Suchanek never gave notice of her intention to take FMLA leave; therefore, it was impossible for them to have interfered with her taking such leave. [Record No. 55, pp. 26–27] However, "an employee is not required to expressly assert [her] right to take leave under the FMLA." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm*, 149 F.3d at 523 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995)).

Suchanek testified that she informed the entire department of both her breast cancer diagnosis and her need to take medical leave. Shay's secretary, Anne Marie Shapla, testified that Shay discussed Suchanek's diagnosis at a staff meeting and informed the staff that Suchanek would miss work for treatments. Shay authorized Suchanek to take eight days leave, albeit temporary disability leave, for her surgery. Suchanek, without question, informed the University she intended to take some form of leave. She did not, however, mention the FMLA. Nonetheless, the information she provided was likely sufficient to "reasonably apprise" the University of Suchanek's "request to take time off for a serious health condition." *Brohm*, 149 F.3d at 523. Thus, she has alleged sufficient evidence to create a genuine issue of material fact as to the notice element.

### 3.    Denial of Rights

Suchanek argues that the University denied her rights under the FMLA because it "failed to meet the statutory requirements for an employer to provide written notice of rights and obligations." [Record No. 64, p. 16]  An employer's failure to comply with the FMLA's notice requirements can constitute a denial of rights.  *See Fink v. Ohio Health Corp.*, 139 F. App'x 667, 671 (6th Cir. 2005).  However, a failure to provide notice only supports an interference claim when "the inadequate notice effectively interfere[s] with plaintiff's statutory rights." *Id.* (internal quotations omitted).

The University claims that it adequately provided notice to Suchanek because its FMLA policies were set out in the employee handbook and available online.  [Record No. 55, p. 27] However, simply providing general notice does not satisfy the full obligation imposed by the FMLA.  Employer notice requirements are outlined in 29 C.F.R. § 825.300.  The regulation requires employers to provide general notice regarding FMLA rights.  *See* 29 C.F.R. § 825.300(a)(3) (requiring that employers include a notice of FMLA rights in employee handbooks).  However, the regulations also require specific, individual notice of rights when "the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason."  29 C.F.R. § 825.300(b)(1).  While the University provided general notice to its employees regarding their rights under the FMLA, Suchanek has testified that it failed to specifically inform her that her leave could qualify for the FMLA.  If true, such a failure would fall short of the FMLA's statutory notice requirement.

The question remains whether the University's failure "effectively interfered" with Suchanek's rights. *Fink*, 139 F. App'x at 671. Suchanek was able to take eight days of leave for her surgery. And she was fully paid for her period of leave. When her treatment was complete, she returned to her position without diminution in salary. While Suchanek's leave was not technically designated FMLA leave, it is difficult to see what greater rights such a designation would have provided. *See Gordon*, 2007 U.S. Dist. LEXIS 31864, at *9–10 (granting summary judgment against FMLA plaintiff when she "received all the medical leave she requested"); *Palmer v. Cacioppo*, No. 09-3924, 2011 U.S. App. LEXIS 13503, at *13 (6th Cir. 2011) (granting summary judgment when the plaintiff had not "demonstrated that the Board denied any FMLA benefit that she was owed. Indeed, the record reflect[ed] that [she] received compensation and benefits for her medical absences"). Because Suchanek was provided paid time off for her medical care, and returned to her same position, she has failed to show that the University's inadequate notice deprived her of any rights during her eight-day leave for surgery.

Suchanek also claims that she was denied notice of her right to take intermittent leave for her radiation treatments. The FMLA does provide for intermittent leave when necessary. *See Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 350–51 (6th Cir. 2008). However, Suchanek completed her treatments over her lunch hour and, therefore, did not miss work to complete them. Her actions prove that the treatments did not render her "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). In other words, Suchanek's ability to complete the treatments without missing work indicates that they were not FMLA-qualifying in the first place. Even if they were, Suchanek has failed to show she suffered a concrete injury as a result of her

lack of notice.  If the University had in fact interfered with Suchanek's FMLA rights, it would be liable to her for "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation."  29 U.S.C. § 2617(a)(1)(A)(i)(I).  At best, Suchanek claims the denial caused her to "loose [sic] the benefit of lunch time" and caused her to "utilize her lunch time for radiation treatment instead of seeking nutrition."  [Record No. 64, p. 17]  In other words, she did not lose any "wages, salary, employment benefits, or other compensation."  29 U.S.C. § 2617(a)(1)(A)(i)(I).  Having to intermittently utilize lunch hours to attend medical appointments is not a sufficient injury to sustain an FMLA claim.  *See Fink*, 139 F. App'x at 671 (when plaintiff fails to show concrete injury, she lacks standing to bring an FMLA claim).

In summary, Suchanek has failed to show that the University's inadequate notice "effectively interfered with [her] statutory rights."  *Fink*, 139 F. App'x at 671.  For her FMLA-qualifying surgery, Suchanek was provided paid time off and received all benefits she would have otherwise been entitled to under the statute.  With respect to the intermittent leave following surgery, Suchanek has failed to show that such leave was FMLA-qualifying or that her ignorance of FMLA rights caused a concrete injury.  Thus, Suchanek has failed to make a prima facie case for FMLA interference, and summary judgment will be granted in favor of the defendants on this claim.

## B.    Disability Discrimination

Suchanek's second claim alleges that the University, through Shay as its agent, discriminated against her on the basis of a disability — her breast cancer — in violation of the

Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. ("KRS") § 344.040. Under the KCRA, it is unlawful for an employer to

> discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, . . . because the person is a qualified individual with a disability . . . .

KRS § 344.040(1). The Sixth Circuit has previously explained that "the language of the Kentucky Civil Rights Act mirrors the language of . . . the Americans with Disabilities Act" ("ADA") and, therefore, KCRA cases can be analyzed by reference to the ADA. *Brohm*, 149 F.3d at 520–21.[1]

A plaintiff can prove that her employer discriminated against her on the basis of her disability two different ways: through direct evidence of such discrimination or through circumstantial evidence following the framework set out in *McDonnell Douglas Corp. v. Green*,

---

1    The ADA was substantially amended in 2008 to "broad[en the] scope of protection . . . available under the [statute]." Pub. L. No. 110-325, § 2, 122 Stat. 3553, 3554. Of particular importance to this case, the 2008 amendments vastly expanded the definition of "disability." *See* 42 U.S.C. § 12102(1)–(4) (2010). However, for purposes of this case, the Court will look to the pre-amendment version of the ADA. Suchanek's claim was brought under the Kentucky Civil Rights Act, which precisely mirrors the ADA's *former* definition of disability. *Compare* KRS § 344.010(4) *with* 42 U.S.C. § 12102(2) (2006). The Court will not assume that the Kentucky legislature, by drafting language in 1992 that mirrored federal law at the time, *see* 1992 Ky. Acts 282, § 1, intended to incorporate federal legislative alterations that occurred in 2008. In fact, the Kentucky legislature amended KRS § 344.040 in 2010, *see* 2010 Ky. Acts 126, § 3, but did not update its definition of "disability," KRS § 344.010(4), to once again mirror the altered federal statute. Thus, the Court will consider ADA case law for guidance in interpreting the KCRA, *see Brohm*, 149 F.3d at 520, but because the relevant Kentucky definitions mirror the pre-amendment ADA definitions, the Court will look to cases which interpreted the pre-amendment formulation (and thus, for interpretation of the ADA, have been superseded by the 2008 amendments). *See, e.g., Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002). It is also worth noting that, even if Suchanek had invoked the ADA, the overwhelming majority of the conduct at issue in this case would be governed by the pre-amendment language. The Sixth Circuit has explained that the amendments "became effective on January 1, 2009," but "do[] not apply retroactively to govern conduct occurring before the[y] became effective." *Millholland v. Summer Cnty. Bd. of Educ.*, 569 F.3d 562, 565–567. Because Suchanek resigned in April of 2009, just four months after the January 1, 2009 effective date, most of the conduct complained of (which largely occurred prior to 2009) would be analyzed under the old ADA provisions in any event. *See id.*

411 U.S. 792 (1973). *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996). Under either test, the plaintiff bears the burden of first establishing that she is "disabled." *See id.* at 1186.

### 1.  Disability

Suchanek has failed to show that she was disabled.  Under the KCRA, an individual is "disabled" if she has:

(a)  A physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual;
(b)  A record of such an impairment; or
(c)  [Been] regarded as having such an impairment.

KRS § 344.010(4).  Suchanek argues that she qualifies as disabled under both (a) and (c) – *i.e.*, that her breast cancer substantially limited her daily activities and she was regarded by Shay as being disabled.  [Record No. 64, p. 18]

As a threshold matter, breast cancer is, without question, an impairment.  *See Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190 (5th Cir. 1996) ("It is undisputed that Ellison's [breast] cancer was an 'impairment.'").  However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota*, 534 U.S. at 195.  One court has explained that "[b]reast cancer per se is not sufficient to render a person diagnosed with, or suffering from, said condition automatically disabled." *Maldonado-Ortiz v. Lexus de San Juan*, No. 09-1771, 2011 U.S. Dist. LEXIS 36259, at *42–43 (D.P.R. Apr. 4, 2011) (internal citations omitted).  In fact, numerous courts have reached the conclusion that an individual with cancer was not legally disabled under the ADA.  *See, e.g.*, *Ellison*, 85 F.3d at 191 (concluding that plaintiff with breast cancer was not disabled); *Maldonado-Ortiz*, 2011 U.S. Dist. LEXIS 36259, at *45–46 (same);

*McNiff v. Town of Dracut*, 433 F. Supp. 2d 145 (D. Mass. 2006) (Plaintiff's cancer did not substantially limit major life activity of working and was thus not a "disability" under ADA); *Schertfager v. Boynton Beach*, 42 F. Supp. 2d 1347 (S.D. Fla. 1999) (plaintiff with breast cancer not disabled); *Imadjlessi v. Macy's W., Inc.*, 993 F. Supp. 736 (N.D. Cal. 1997) (breast cancer did not substantially limit plaintiff's ability to work). However, the Court will examine the unique facts of Suchanek's impairment and determine whether it qualifies as a disability under the KCRA.

### a.    Substantially limits major life activities

Suchanek argues that her breast cancer and the continuing effects of her treatment substantially limited her major life activities. In support of this contention, Suchanek lists her symptoms – a compromised immune system, self-limiting burns, fatigue, nausea, insomnia – and argues that the symptoms limited her ability to do her job. [*Id.*, pp. 18–19] Suchanek argues that her doctors' visits, fatigue, and nausea caused her to miss work, and that as a result of the combination of symptoms, "she was unable to do her job the same way." [*Id.*, p. 19] Thus, she argues that her breast cancer limited the major life activity of working.

The Supreme Court has provided guidance in determining whether an impairment limited the life activity of working under the pre-amendment ADA. The Court concluded that, at minimum, the term "substantially limits" requires that "plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 491 (1999).

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs.

-14-

> Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id.* at 492.  Put differently, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *McKay v. Toyota Mfg. U.S.A., Inc.*, 110 F.3d 369, 372 (6th Cir. 1997).  Suchanek has not pointed to facts in the record sufficient to raise a genuine issue of material fact as to this theory.

First, Suchanek has failed to make the case that her symptoms preclude her from performing a broad range of jobs.  Suchanek merely argues that "she was disabled because she was not able to do *her* job the same way."  [Record No. 64, p. 19 (emphasis added)]  Such an assertion is insufficient to prove that her impairment "substantially limits" her ability to work.

Second, even if the limitations she alleges extended to a broad range of jobs, a "mere difference" does not amount to a "substantial[] limit[ation]." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999).  Suchanek has, at best, argued that she was not able to perform her job in "the same way."  [Record No. 64, p. 19]  But not all limitations are "substantial limitations."  The evidence shows that Suchanek was able to carry her job for more than three years after her breast cancer diagnosis and treatment.[2]  After she left the University, Suchanek took another job as the Director of Stewardship and Development for Mary Queen of the Holy

---

2       Suchanek argues that she was limited in her job because she often had to leave work early due to nausea.  Rather than help her case, alleging that she consistently missed work would likely prevent her from carrying her burden and proving that she was "otherwise qualified" to perform the essential functions of her job.  *See Shelton v. Charlotte-Mecklenberg Hosp. Auth.*, No. 05-520, 2006 U.S. Dist. LEXIS 87305, at *16 (W.D.N.C. Nov. 29, 2006) (explaining that a plaintiff who argued that consistent absences proved her disability instead condemned her case by showing that she could not "perform the essential functions of the job"); *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (employee who cannot meet the attendance requirements of the job cannot be a "qualified" individual protected by the ADA); *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994) (holding that "coming to work regularly" is an "essential function" under the ADA).

Rosary Parish. *Cf. Smaw v. Va. Dep't of State Police*, 863 F. Supp. 1469, 1475 (E.D. Va. 1994) (considering claimant's current employment in determining she was not substantially limited in the major life activity of working). The evidence shows that she was able to both continue at her present job and find new employment, and thus she has failed to establish that she was substantially limited from performing a broad range of jobs.

### b.     Regarded as having such an impairment

Suchanek also argues that, if her disability did not substantially limit her daily activities, she was at least regarded as being disabled by Shay. There is no question that Shay was aware Suchanek had breast cancer. Further, Suchanek has shown that, at the time of her 2006 evaluation, Shay believed (whether by prompting of Suchanek or on his own) that Suchanek's breast cancer affected her work. [Record No. 55-16 ("Jeanne's work with donors this year did diminish because of her recovery from breast cancer.")]

Suchanek has shown that Shay regarded her as having an impairment (breast cancer) and believed her impairment affected her ability to do her job. But that does not satisfy her burden. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001); *see also Nagel v. Husky Lima Refinery*, No. 09-828, 2011 U.S. Dist. LEXIS 30122, at *20 (N.D. Ohio March 23, 2011) (finding plaintiff had not shown employer regarded him as disabled, despite testimony from his supervisor that "Plaintiff was disabled because he could not perform the duties of his job"). Instead, Suchanek "must show that the employer regarded [her] as disabled within the meaning of the ADA." *Ross*, 237 F.3d at 709 (internal quotations omitted). To meet this standard, Suchanek must show that Shay either mistakenly believed she had "a physical impairment that

substantially limit[ed] one or more major life activities" or that he "mistakenly [believed] that an actual, nonlimiting impairment substantially limit[ed] one or more major life activities." *Sutton*, 527 U.S. at 489. Under either prong, Suchanek has failed to make a sufficient showing. As previously explained, a substantial limitation on the major life activity of working requires more than a change in the ability to do a particular job. *McKay*, 110 F.3d at 372. Suchanek has not alleged that Shay believed her impairment "substantially limited her in her life activity of working in a broad class of jobs." *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 568 (6th Cir. 2009). Thus, she has failed to show that Shay regarded her as disabled under the meaning of the ADA. *See Ross*, 237 F.3d at 709.

Suchanek has failed to show that she is disabled under the KCRA. Therefore, there is no genuine issue of material fact as to an essential element of her claim, and summary judgment will be granted in favor of the defendants on Count Two. *See Millholland*, 569 F.3d at 568.

## C. Hostile Work Environment and Constructive Discharge

Suchanek alleges two additional claims — hostile work environment and constructive discharge – under the KCRA. However, given the Court's conclusion that Suchanek was not disabled, neither claim can survive.

Kentucky law does not recognize independent claims of hostile work environment or constructive discharge – they are actionable only through the KCRA. *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 807 (Ky. 2004) (constructive discharge claim brought through KCRA); *Becker v. Saber Mgmt.-Ky., LLC*, No. 2009-89, 2009 Ky. App. LEXIS 994 (Ky. App. Nov. 25, 2009) (hostile work environment claims are brought through the

KCRA). Each is a type of "adverse employment action" under the KCRA. *Brooks*, 132 S.W.3d at 807. Thus, a KCRA claim relying on either theory would still require the plaintiff to show that she was a member of a protected class. KRS § 344.040; *see Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1996) (explaining that the first element that must be proved in a civil rights claim based on a hostile work environment is that the plaintiff "was a member of a protected class, that is, he was disabled"). Because Suchanek is not legally disabled, she is not a member of a protected class. Thus, even poor treatment at work would not justify a KCRA claim. Suchanek's hostile work environment and constructive discharge claims necessarily fail because she was not disabled under the KCRA. Summary judgment will also be granted in the defendants' favor on Counts Three and Four.

### D. Retaliation

Suchanek also argues that she was retaliated against for filing a complaint with the University's Office of Institutional Equity. [Record No. 64, pp. 30–32] Suchanek claims that she initially spoke with the office in February of 2008 and filed a formal complaint in March of 2008. [*Id.*, p. 31] Suchanek believes that, as a result of filing her complaints, she received negative performance evaluations and experienced interference in the performance of her job. [*Id.*] The alleged interference came through not being invited to development meetings, not being given information about donors, and the University using an arbitrary procedure to adjust her job standards. [*Id.*] While Suchanek alleges a litany of potentially adverse employment actions, she wholly fails to establish a causal connection between the alleged actions and her complaint.

To support a claim for retaliation, a plaintiff must establish that: (1) she engaged in protected activity; (2) the employer was aware of her protected activity; (3) the employer took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Brooks*, 132 S.W.3d at 803; *see also Clark v. Sanofi-Synthelabo, Inc.*, 489 F. Supp. 2d 759, 767 (W.D. Ky. 2007). The University has admitted that Suchanek engaged in protected activity by filing a claim with the Office of Institutional Equity. [Record No. 55, p. 39] Additionally, viewing the evidence in the light most favorable to her, Suchanek has established a genuine issue of material fact that (i) Shay was aware of her complaint and (ii) the sum-total of the alleged actions amounted to an adverse employment action. However, Suchanek has failed to establish a causal connection between the two.

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). Suchanek points to four facts which she alleges display the causal connection between her complaint and the adverse actions:

> (1) the proximity between her initial February 2008 complaint with Human Resources and her Office of Institutional Equity March 2008 complaint with her 2007 evaluation also signed in March 2008; (2) the fact that she was told she met goals of the 2008 PIP inferring a satisfactory job performance but then given a less than satisfactory (3.0 rating) on the 2008 evaluation in February 2009; (3) the hostile conduct of Shay on an interpersonal level (i.e. yelling, pointing fingers and charging, and slamming fist on the table); and (4) reference to her complaint and allegations of retaliation in a letter dated July 14, 2008.

[Record No. 64, pp. 31–32] The second and third points – while describing what could be construed as adverse actions – provide no information whatsoever to connect those actions to

Suchanek's discrimination complaint. *See Keeling v. Horizons Youth Servs.*, No. 10-23, 2011 U.S. Dist. LEXIS 72061, at *10 (E.D. Ky. July 5, 2011) (granting summary judgment when plaintiff "discuss[ed] events that occurred between [the] filing of [his] EEOC claim and termination, without explanation or argument as to how the two might be related").]

Suchanek's first asserted "causal connection" (i.e., the proximity between her complaint and a poor evaluation) is unpersuasive. First, "temporal proximity itself is insufficient to find a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). Second, in this case, the temporal proximity provides almost no weight for Suchanek's claims. Campus-wide evaluations were due in March 2008. [*See* Record No. 55-21, p. 6 (letter from Dean Shay explaining that by March 24, 2008, Suchanek's evaluation was already late)] Thus, the temporal proximity between Suchanek's poor evaluation and her complaint resulted from the University's schedule, not a nefarious motive. Third, the March 2008 evaluation was not Suchanek's first (or last) poor performance evaluation. It is difficult to accept Suchanek's argument that the poor evaluation was retaliation for her discrimination complaint when the preceding evaluation (for 2006) was also negative. Under these facts, the March 2008 evaluation was a step in Suchanek's progressively worsening evaluations; it was not an outlier that would have been uniquely motivated by her complaint. Therefore, the temporal proximity between Suchanek's complaint and her March 2008 evaluation fails to establish the requisite causal connection.

Finally, reference to the July 14, 2008, letter is likewise unavailing. In Shay's letter to Suchanek, he wrote:

> There are 3 items that you raised (in writing) in your response to the PIP that I need to address. The first is your continued reference to my alleged "retaliation" which you peppered throughout the PIP. I must take this opportunity to point out that you misquoted and took out of context what I noted relative to your medical situation in your 2006 Performance Evaluation. But more importantly, at your request, Patty Bender has investigated your accusation and has found no basis in your claim. If you feel the need to further pursue this issue, please get back in touch with Patty Bender but do not continue to refer to it in any correspondence with me.

[Record No. 55-24] It is unclear precisely how Suchanek believes this statement displays a causal connection between her complaint to the Office of Institutional Equity and the adverse actions she alleges. At best, it satisfies the second element of a retaliation analysis: that Shay was aware of Suchanek's protected activity. *See Brooks*, 132 S.W.3d at 803. However, when taken in context, this statement merely illustrates that Suchanek had already accused Shay of "retaliation," and her accusations had been investigated and dismissed. It provides no basis to conclude that later actions were retaliation for Suchanek's complaint.

Suchanek has failed to establish a causal connection between the alleged adverse employment actions and her protected activity. Because she has failed to establish this element, her prima facie case of retaliation cannot proceed and the Court will grant summary judgment to the defendants on Count Five.

### E. Breach of Implied Contract

Next, Suchanek alleges that the University breached an implied contract by altering her job and evaluation standards without following the protocol for such changes outlined in the University's employment manual. [*See* Record No. 64, p. 32–33] More specifically, Suchanek

claims that Shay violated Human Resources Policy and Procedure Number 61.0, which provides in part (under the heading "Performance Evaluation"):

> Evaluation is an ongoing process that results in a year-end review. A midyear review is optional.
> 1) The first two steps of a [Performance Evaluation] involve a review of the following:
>> a. The employee's performance during the last review period as conducted by the supervisor; and
>> b. The essential functions of the position held by the employee and the amount of time spent performing each function of the job. This will be conducted jointly by the employee and the supervisor. If changes are necessary, adjustments to the Job Analysis Questionnaire (JAQ) for the position will be made.

[*See* Record No. 55-22] Suchanek argues that the Defendants violated this policy by changing her job standards without changing her JAQ. [Record No. 64, p. 33]

Under Kentucky law, "an express personnel policy can become a binding contract 'once it is accepted by the employee through [her] continuing to work when [s]he is not required to do so.'" *Parts Depot, Inc. v. Beiswenger*, 170 S.W.3d 354, 362 (Ky. 2005) (quoting *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 733 (Ala. 1987)). The Kentucky Supreme Court has explained that the "principle is akin to estoppel. Once an employer establishes an express personnel policy and the employee continues to work while the policy remains in effect, the policy is deemed an implied contract for so long as it remains in effect." *Parts Depot, Inc.*, 170 S.W.3d at 363.

Suchanek's implied-contract claim fails for a number of reasons. First, she fails to allege precisely how Shay and the University changed her job standards. On a motion for summary judgment, the nonmoving party "must point to affirmative evidence on critical issues sufficient

to allow a jury to return a verdict in its favor." *Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010). It is not the Court's duty to "search the entire record" to find evidence which creates a genuine issue of fact. *Id.* (internal quotations omitted). Thus, simply alleging that the Defendants violated policy "by not changing her JAQ before requiring new standards," [Record No. 64, p. 33] without specifically describing the change in standards, is insufficient to survive summary judgment.

Second, even after a review of the record, it does not appear that the University breached its policy. Suchanek seems to be arguing that Shay held her to progressively higher standards as their relationship soured. However, Policy 61.0 distinguishes between job standards and essential job functions. [*See* Record No. 55-22, p. 1] Policy 61.0 requires an amended JAQ to change the essential functions of a position, but does not require the same procedure to alter standards. This point is further supported by the fact that the University's JAQ for the position only lays out the essential job functions, not the standards for evaluating completion of those functions. [Record No. 55-5, p. 21] Thus, the record does not support Suchanek's claim that the University could not update her job standards without altering her JAQ. From the beginning, "fund raising" was an essential job function for Suchanek. [*Id.*] Suchanek was evaluated, even in 2008, on her performance in fund raising. Even if Policy 61.0 created an implied contract, it did not require the University to alter Suchanek's JAQ in order to raise its standards for her performance in fund raising. Therefore, the University did not breach an implied contract with Suchanek.

## F.     Intentional Infliction of Emotional Distress

Suchanek's claim for intentional infliction of emotional distress also fails as a matter of law.  Under Kentucky law, a plaintiff cannot assert a claim for intentional infliction of emotional distress for the same conduct that gave rise to a KCRA claim.  The KCRA permits recovery for emotional damages such as humiliation and embarrassment.  *See McNeal v. Armour & Co.*, 660 S.W.2d 957, 958–59 (Ky. App. 1983); *see also Mitchell v. Seaboard S. R.R.*, 883 F.2d 451, 454 (6th Cir. 1989) (explaining that the KCRA authorizes recovery for "damages for humiliation and emotional distress").  "Under Kentucky law, when damages for emotional distress are available through a traditional state tort claim, and the conduct was not intended only to cause extreme emotional distress, an emotional distress claim will not lie." *Messick v. Toyota Motor Mfg., Inc.*, 45 F. Supp. 2d 578, 582 (E.D. Ky. 1999) (citing *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993)).  Because Suchanek asserted a KCRA claim – which allows her to recover for emotional damages – against the University based on the same conduct that underlies the present claim, her intentional infliction of emotional distress claim against the University fails.  However, Suchanek correctly responds that the KCRA does not impose individual liability for employment discrimination.  *See Effinger v. Phillip Morris, Inc.*, 984 F. Supp. 1043, 1045–46 (W.D. Ky. 1997) (citing *Winston v. Hardee's Food Sys., Inc.*, 903 F. Supp. 1151, 1155 (W.D. Ky. 1995)).  Therefore, her intentional infliction claim against Shay in his individual capacity would not be subsumed by her KCRA claim.

Nevertheless, Suchanek has failed to establish a prima facie case of intentional infliction of emotional distress against Shay.  To support a claim of outrage, or intentional infliction of

emotional distress, a plaintiff must establish that (1) the wrongdoer's conduct is intentional or reckless; (2) the conduct is outrageous and intolerable in that it offends the generally accepted standards of decency and morality; (3) there is a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the distress suffered must be severe. *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000). Kentucky courts have set a high bar for conduct to be outrageous and intolerable. A claim cannot succeed based on "petty insults, unkind words, and minor indignities." *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996). Nor will the tort compensate behavior that is merely "cold, callous, and lacking in sensitivity." *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 4 (Ky. 1990). To satisfy this burden, a plaintiff must allege behavior that is "beyond all decency." *Id.*

Suchanek claims that Shay slammed his fists on the desk, pointed his finger and lunged at her, and raised his voice to yell at her. [Record No. 64, p. 34] Even if true, these assertions show, at worst, a "lack of compassion" and poor management, but certainly do not rise to the level of seriousness required by *Osborne*, *Kroger*, and *Seitz*. *Seitz*, 796 S.W.2d at 4. Shay's actions may have been callous and unwarranted, but are not, as a matter of law, "beyond all decency." *Id.* Therefore, Suchanek's claim for intentional infliction of emotional distress also fails.

## IV.    Conclusion

Suchanek has failed to present a prima facie case regarding any of her seven claims. She has not shown that she was denied a right under the FMLA, that she was disabled under the KCRA, or that there was a causal connection between her employment complaint and the

defendants' actions. She has also failed to show that the University violated an implied contract or assert evidence sufficient to support a claim for intentional infliction of emotional distress. Accordingly, it is hereby

**ORDERED** as follows:

1.     That the defendants' Motion for Summary Judgment [Record No. 55] is **GRANTED**.

2.     The defendants' pending Motion in Limine [Record No. 78] is **DENIED** as moot.

3.     The pretrial conference and trial dates are **VACATED** and **CANCELED**.

4.     A separate judgment will be entered this date in favor of Defendants University of Kentucky and Robert Shay, in his official and individual capacities.

This 25th day of July, 2011.



Signed By:
*Danny C. Reeves*
United States District Judge